## CHARLES E. PATTERSON v. STATE.

No. A-6088. Opinion Filed March 16, 1929.
(275 Pac. 387.)

256

Mauntel & Spellman, Howard W. Patton, and Mathers & Whiteside, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, P. J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Woodward county on a charge of robbery with firearms, and was sentenced to serve a term of 10 years in the state penitentiary.

On the date charged, a bank at Sharon was

robbed and about $2,500 taken. The robbery was accomplished by two men who appeared at the bank in a Ford touring car. The state contends: That defendant, Jim Cellen, and Bob Evans planned and carried out this robbery. That on February 18 they familiarized themselves with the time of the opening of the bank at Sharon, and that afternoon they stole a Ford touring car at Enid, left there late in the day with the touring car and a Ford coupe, in which they had gone to the community at Sharon, which they planned to use as a get-away car. They proceeded to a place near Sharon, spent the night, and defendant and Cellen went to the bank early next morning and accomplished the robbery while Evans remained with the coupe about 2 miles out of the town. After the robbery, they drove 2 miles north from Sharon, abandoned the touring car, and Cellen and Evans concealed themselves in the back of the coupe, and defendant drove to the town of Seiling, a distance of from 33 to 37 miles from Sharon. While at the town of Seiling for some 40 minutes, Cellen and Evans remained concealed in the back of the coupe. Before reaching Seiling, a witness followed the car for some 20 miles and asked defendant to stop in the town so that the officers might investigate, as the robbery had been reported, and he attempted to detain defendant until the officers arrived. Defendant drove away, and this witness, Harve Wreath, jumped on the running board and went with him for about a mile, when he was forcibly ejected from the car and ordered to go back. Defendant drove about 6 miles to an obscure road, where the money was hidden, and Cellen and Evans concealed themselves in the brush. He was arrested late that afternoon. Defendant denies all the testimony of Cellen and contends that he never saw him or Evans, and made the defense of an alibi, and to that end ad-

mits he was a whisky runner, and explains some of his actions by reason of that fact.

The first contention made is that there is no corroboration of the testimony of Cellen, an admitted participant in the robbery. An examination of the record refutes this contention. Oscar Winstead, a schoolboy, testified in part:

"* * * Q. Oscar, I will ask you to state to the court and jury where you lived on the 19th day of February, 1925. A. Six miles east of Sharon and three-quarters of a mile south and a quarter east. Q. Do you remember the day of the bank robbery at Sharon? A. Yes, I remember the day. * * * Q. Did you see any cars on the road that morning, as you was going to school? A. I did, yes, sir. Q. What kind of cars did you see? A. I saw a Ford car and a coupe. Q. Which way were they going? A. They were going west. Q. Was that in the direction of Sharon or not? A. Yes, it was. Q. State whether or not you did anything when those cars passed you on that morning. A. When the first car passed me, I kind of hollowed or waved like, in order to get them to stop and they went right on and when the coupe passed me, I didn't say a word. Q. What did you next notice occur with reference to those two cars? A. The touring car was in the lead and it stopped to the right of the road and the coupe drove up by the side to the left of it and they talked a short time. Q. Then after that, what happened, if anything? A. They drove on. Q. What kind of a car was that touring car? A. It was a Ford. Q. What model did it appear to be? A. A 1925 model. Q. What was the condition of that car with reference to being new or old? A. It was new. It was a new looking car. Q. What kind of a looking car was this coupe? A. It was a new looking car. It was a very nice looking car. Q. Did you notice how many men were in that Ford touring car? A. Yes sir, I did. Q. How many were there? A. There were two. Q. How many men were in the Ford coupe? A. There was one in it. Q. What time of the morning was that? A. Well, sir,

I would judge that it would be somewhere between eight and 8:30 o'clock or something like that. * * *"

This testimony of Winstead corroborates very substantially a portion of the testimony of the accomplice Cellen.

Pearl L. McNeil testified that he knew defendant, saw him in the town of Sharon on February 18, the day before the robbery of the bank, and then testified:

"* * * Q. When did you next see the defendant? A. The next morning, on the morning of the 19th. Q. Where did you see him? A. I saw him pass my residence the next morning. Q. In what part of the town of Sharon is your residence situated? A. In the northwest part of the town. Q. Do you know where the Sharon State Bank is located? A. Yes, sir, I do. Q. How far was your residence from the Sharon State Bank? A. It is just a block. Q. At the time you saw him passing your residence there in the town of Sharon, in what was he traveling? A. In a Ford touring car. Q. With respect to being new or old, what was the character of the car? A. It was a new car. * * * Q. Just describe the car to the court and jury. A. It was a touring car and it had on side curtains. It was a new car. Q. What kind of a car was it, if you know? A. It was a Ford car. Q. Do you know whether there was any one in the car with him, at the time, or not? A. No sir, not as I saw. Q. Did you know the direction in which he was going? Do you know that? A. Yes, sir, I do. Q. In what direction was he going? A. He was going north. Q. Do you know about what time of day that was? A. I place the time at about 8:30 o'clock. Q. Did you see him again that day? A. Yes, sir, I did. Q. Where was it you next saw him that day? A. Sitting in front of the bank in this car, in a Ford touring car. * * * Q. How close were you to the defendant at that time? A. It was about thirty feet. Q. Did you see any one else? A. Yes, sir, I did. Q. Who did you see, if you know? A. Well, I don't know as I can give the gentleman's name. Q. Have you since learned his name? A. I have. Q. What did you

learn his name to be? A. I learned it to be Cellen. * * * Q. Where was he at the time you passed the car? A. He was standing on the sidewalk in front of the bank door. Q. About what time of the morning was that? A. It was right at nine o'clock. Q. How long was it after this time that you learned that the bank had been robbed? A. It was about ten minutes; or fifteen minutes. * * *"

This testimony corroborates materially the testimony of Cellen in reference to the time of entering the town of Sharon until after the robbery of the bank.

L. E. Wheeler, superintendent of schools at Sharon, testified he saw defendant in the town of Sharon the day before the robbery, talked with him, and after the robbery saw him in the jail at Woodward and identified him as the same person, as follows:

"* * * Q. What time before had you seen him? A. Well, I saw him in the morning before the bank was robbed, around eight o'clock. Q. Where was that, in the town of Sharon? A. It was right in front of the restaurant on the west side of the street. Q. State whether or not you had an opportunity to plainly observe him at that time. A. Yes, sir, I did. Q. State whether or not you engaged him in conversation. A. Yes, sir, I did. Q. How long did you talk to him? A. Oh, I judge I talked to him about ten minutes or maybe it was fifteen minutes. Q. You identify the defendant Charles E. Patterson here as being the man you talked with at that time? A. Yes, sir, I do. * * *"

Then being asked if there was anything about defendant that enabled him to identify defendant, said further:

"* * * A. Yes, sir, there was. Q. Just state what it was. A. He had a watch chain, a heavy watch chain with an Elk emblem on it. Q. Was there anything else about him that caused you to identify him? A. Yes, sir, there was. Q. What was it? A. And a dark spot

on his face. Q. Where was that dark spot on his face located? A. On the left side of his face. * * *''

This testimony also corroborates the testimony of Cellen.

R. D. McHard testified, in substance, that he is a farmer living south of Mooreland, and that on the morning of February 19, about 7 o'clock, he saw two cars pass his place, one a Ford touring car and the other a Ford coupe going in the direction of Sharon; that the touring car was a new car and the coupe appeared to be a 1924 model. This also strongly corroborates the testimony of Cellen. In the light of this and the other testimony in the record, the contention that the accomplice is not corroborated is wholly untenable. There is an abundance of corroboration.

As we have stated, it was the theory of the state that Cellen and Evans were concealed in the back of the coupe at the time defendant was in the town of Seiling. There was introduced in evidence certain photographs showing the car with two men in it and the back part of the car closed. Defendant is aggrieved at the admission of this evidence, insisting that it is not corroboration and the admission of these photographs prejudicial. This evidence would not be corroboration of the testimony of Cellen except as showing the possibility that two men might be concealed in the back of a Ford coupe. If this were the only evidence in corroboration, the contention would be well taken.

Next it is argued that the court erred in his instruction on the law of alibi. This instruction is: "Gentlemen of the jury, you are instructed that one of the defenses interposed by the defendant in this case is an alibi; that is, that the defendant was at another place at the identical time the crime was committed,

if committed at all. If, in view of all the evidence, you have any reasonable doubt as to whether the defendant was at another place from where the crime was committed at the time of its commission, then you should acquit; but if you believe from the evidence that the accused was not so far away from the place where the offense was committed, but that he could with ordinary exertion have reached the place where the offense was committed, then you will consider that fact as a circumstance tending to prove or disprove the alibi."

This instruction is not happily worded, and is not approved as a model, but, as was said in the case of Spess v. State, 20 Okla. Cr. 94, 201 P. 395, alibi amounts to nothing more than a mere traverse of the material averments of an information or indictment, and that any person of ordinary intelligence is able to understand and comprehend that, if a person accused of a crime was at another different and distinct place at the time, whose presence at the scene of the crime is relied on for conviction, it is impossible for him to have committed the offense. See, also, Alvarado v. State, 38 Okla. Cr. 360, 261 P. 983. An instruction upon the subject of alibi must need be erroneous to the extent that it substantially prejudices a defendant before we would feel warranted in reversing a case for an error in stating the law of alibi.

Defendant requested an instruction that his admission that he was engaged in the violation of the liquor law should not be considered in arriving at a verdict of guilty in this case. It might have been well for the court to have cautioned the jury upon this point, but certainly we cannot say the jury were so wanting in intelligence that the failure to so instruct would have led them to find him guilty of robbery.

In advising the jury as to the punishment for the

crime charged, the court instructed them that the maximum penalty was death and the minimum punishment imprisonment for a term of not less than five years; the court evidently having in mind that chapter 44 of Session Laws of 1925 was in force at the time of the commission of this offense. In this the court was in error. The punishment at that time was fixed by section 1, c. 85, Session Laws 1923, and the minimum punishment was confinement in the penitentiary for a term of not less than 25 years. The court and county attorney should have been better advised. In Lilly v. State, 7 Okla. Cr. 284, 123 P. 575, Ann. Cas. 1914B, 443, it was said, in substance, that the punishment for an offense should be under the statutes as they existed at the time the offense is committed. See, also, Ensley v. State, 4 Okla. Cr. 49, 109 P. 250; State ex rel. v. Mc-Cafferty, 25 Okla. 2, 105 P. 992, L. R. A. 1915A, 639; Williams v. State, 7 Okla. Cr. 529, 124 P. 330. A very similar question was before this court in the recent case of Cornett et al. v. State, 40 Okla. Cr. 172, 267 P. 869, in which it was held:

"Where the court in its instructions submits to the jury a smaller penalty for the offense than that prescribed by law, but of the same kind, and where the defendant does not call the attention of the court to, nor except to, the error in defining the punishment, and a smaller penalty is assessed by the jury, the error being beneficial to defendant, the defendant, upon appeal, will not be heard to complain that such instruction is prejudicial. The error in such case is not reversible."

The difference between that case and this is that here the instruction was excepted to. Trial courts and prosecuting officers should inform themselves of the provisions of the statutes applicable to a crime charged and see that the instructions properly charged the statute. Except for the fact that the error is favorable to defendant, we would be compelled to reverse this case.

264

Under the record there would seem to be no question of the guilt of the accused. He was fairly tried, and such errors as appear were either favorable to him or without any substantial prejudice.

The case is affirmed.

DAVENPORT and CHAPPELL, JJ., concur.