## J. R. BOND v. STATE.

No. A-8357. Sept. 2, 1932.
Rehearing Denied Sept 30, 1932.
(14 Pac. [2d] 425.)

C. A. Ambrister, Harry G. Davis, and Ledbetter, Stuart, Bell & Ledbetter, for plaintiff in error.

J. Berry King, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., and Phil. Oldham, for the State.

CHAPPELL, J.   Plaintiff in error, hereinafter called defendant, was convicted in the district court of Muskogee county of the crime of arson in the second degree, and his punishment fixed by the court at imprisonment in the state penitentiary for a period of four years.

Defendant contends first that the evidence is insufficient to sustain the verdict, because the evidence of Harry Castator, an accomplice, was not sufficiently corroborated to connect defendant with the offense.

The evidence of the state was that on July 1, 1931, defendant obtained title to a large home in the city of Muskogee; that he was a resident of Oklahoma City and maintained a home there and had no use for this Muskogee property as a residence for his family; that between April 15th and July 8th, the property had been extensively advertised for sale, but no offer worth considering had been received; that the property was mortgaged for $9,000, with

a $9,000 insurance policy payable to the holder of the mortgage and $15,000 additional insurance payable to defendant; that these premises had been built by O. T. Graham and were occupied by him at the time the property was disposed of to defendant, and that Graham remained in possession of the property at a rental of $150 for a month and a half and $50 per month thereafter, and which possession was to continue until August 1st; that defendant for a number of years had been acquainted with and friendly to Harry Castator, who resided at Bristow, Okla., and was employed by the Ford Hardware as a salesman; that on the 8th day of July, defendant came to Bristow and got Castator in his car, took him out on the road, and told him that he wanted a house in Muskogee burned, and promised Castator $1,000 if he would set fire to it; that they went back to the hardware store and Castator told Ford that he wanted a leave of absence to go to Tulsa; that thereupon defendant and Castator got in defendant's car and drove to Muskogee for the purpose of looking the house over and making arrangements to burn it; that when they reached Muskogee, defendant introduced Castator to the Grahams, not by name but merely as a painter, and explained that having disposed of the property he would have to have some painting done and wanted Castator to look it over; that on the 18th day of July, defendant wrote to Mrs. Graham, who was at that time in Oklahoma City, telling her that he would want possession of the place on the 20th day of July; that on the 25th day of July, and while the Grahams were vacating the premises, defendant came and told Graham he had sold the place; that Graham gave defendant the key for the Yale lock to the front door and a key to the side door, which defendant took away with him; that the keys for the other doors were gathered up and placed by defendant in a

drawer in a cabinet in the house; that on the morning of July 31st, this residence was badly damaged by fire, the remains of which showed it to be of incendiary origin.

Castator testified that on the 25th of July, defendant took him to Muskogee to look the house over and plan the fire; that he told defendant it was too big a job for one man and that, with defendant's consent, he arranged for Frank Schribner to help him; that defendant left him at Bristow and told him to get Schribner and be in Muskogee on Sunday morning and meet him at the Graham home, at 9 o'clock; that they met defendant there and went over the house together and figured out the best plan to burn the house; that defendant suggested they should use not less than 30 gallons of gasoline; that it was there agreed that the witness, Schribner, and defendant would meet at the house on the next Wednesday, with the gasoline; that defendant said he had two keys given him by Graham, and gave him one of them, and he used that to get into the house through the side door; that the key exhibited to him by the county attorney was the one received from Bond and used to get into the house; that defendant gave him the key and $25 expense money before they left the house; that on the 28th day of July he bought six cans of gasoline and a bucket with the money given him by defendant; that he and Schribner left Bristow on Wednesday and got to Muskogee about 5 o'clock; that they drove into the alley back of the Graham house and carried the gasoline into the house; that they got into the house with the key given to him by defendant; that they then left Muskogee and drove to Okmulgee and came back to Muskogee about 1 o'clock in the morning; that they found a car in the garage and, being afraid to burn the house, they went back to Bristow; that the next day they went to Oklahoma City and went to defendant's

residence; that at that time they told defendant what they had done; that defendant gave the witness a check for $10 as additional expense money; that this check was in witness' possession when he was arrested; that they went to Muskogee, entered the Graham home, opening the side door with the key defendant had given witness, and carried five gallons of gasoline upstairs in the attic and poured it in some boxes and on the floor and down the stairway to the second floor, and poured two five-gallon cans on the second floor, and left a small bucket full of gasoline setting on the second floor; on the first floor and the stairway they scattered three five-gallon cans and left a water bucket full of gasoline at the stairway; that they soaked some rags in gasoline and tied them together to lead from the bucket of gasoline to the door on the west side of the house and to the back; that Schribner touched a match to this gasoline soaked rag and they hurriedly left town, and came back some hours later; that on Sunday morning following the fire, defendant came to his residence and told him the county attorney had called him to Muskogee to talk about the fire; that defendant made an appointment to meet the county attorney in Muskogee, Monday; that Castator put the key to the Graham house, given him by defendant and used to open the house at the time it was burned, on a rock under the corner of the house where he lived; and that this key was later found by the fire marshal.

Defendant admitted in his testimony that he met Castator at the times and places testified to, and that he gave him the money and the check, but explained it by saying that Castator was an important witness in a case pending in court, and that the trips were over that case and the money given for Castator's expenses in that case.

Counsel for defendant contend that the record fails to show sufficient corroboration by evidence other than that of the accomplice to connect Bond with the crime.

The state admits that Castator was an accomplice and the trial court so instructed the jury.

There are certain established principles of law which control this court in its consideration of the sufficiency of the corroboration of an accomplice:

1. Section 2701, C. O. S. 1921, while providing that a conviction cannot be had upon the testimony of an accomplice unless such testimony is corroborated, only requires such corroboration as tends to connect the defendant with the commission of the crime.

2. That the corroborative evidence need not be direct, but may be circumstantial.

3. That it is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. When the accomplice is corroborated as to some material fact, or facts, by independent evidence tending to connect the defendant with the commission of the crime, the jury could from that infer that he spoke the truth as to all.

4. It is not necessary that the corroborative evidence shall fall from the lips of other witnesses. The defendant may provide corroborative proof by his own conduct, such as by confessing the crime, or by his explanation, or by failure to produce available evidence or the like.

In addition to the foregoing general principles, in Key v. State, 38 Okla. Cr. 169, 259 Pac. 659, this court said:

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

This court has many times had under consideration the question of the corroboration necessary for an accomplice, the more recent cases being: Underwood v. State, 36 Okla. Cr. 21, 251 Pac. 507; McCurdy v. State, 39 Okla. Cr. 310, 264 Pac. 925; Cloud v. State, 41 Okla. Cr. 395, 273 Pac. 1012; Varner v. State, 42 Okla. Cr. 42, 274 Pac. 43; Patterson v. State, 42 Okla. Cr. 255, 275 Pac. 387; Bradley v. State, 43 Okla. Cr. 456, 279 Pac. 920; Fortman v. State, 45 Okla. Cr. 23, 280 Pac. 1109; Morton v. State, 46 Okla. Cr. 361, 287 Pac. 1087.

In cases of this kind it is always competent to show motive of the defendant, but the motive alone would not be sufficient corroboration. It is also competent to show prior and after association in or near the place where the crime was committed, and to show that defendant furnished the means whereby the crime was committed, as in the case of the keys and the furnishing of the money to buy the gasoline. The fact that defendant was in communication with and in the company of the witness the next day after the fire was a circumstance considered with all the others which tended to connect him with the commission of the offense. The finding of the check given by defendant to the witness on the day before the fire was set, is perhaps the strongest evidence tending to connect defendant with the commission of the offense. When all the facts and circumstances in the case are considered together and these facts are measured by the rules of law above stated, it is apparent that there is evidence which

tends to connect the defendant not only with the witness Castator, but also with the commission of the offense itself.

Defendant next contends that the court erred in refusing to give his requested instruction upon the evidence necessary to corroborate an accomplice.

The court on its own motion gave the usual instructions upon this question. No exceptions were saved to these instructions and no objections made thereto.

This court has repeatedly held that where the instructions given sufficiently cover the law as contained in the requested instructions, it is not error to refuse to give them, although the same may correctly state the law. Ussaery v. State, 22 Okla. Cr. 397, 212 Pac. 137; Lacy v. State, 30 Okla. Cr. 273, 236 Pac. 53; Nowabbi v. State, 31 Okla. Cr. 158, 237 Pac. 868.

Defendant next contends that he was prevented from having a fair and impartial trial because of the prejudicial remarks of the trial judge.

A careful examination of the record discloses no prejudicial remarks or conduct sufficient to require a reversal of the case. It appears from the record that the case was hotly contested, and that counsel for defendant provoked some of these remarks by his conduct in the trial.

This court has held that a judgment of conviction will not be reversed because of the remarks of the trial judge, where such remarks were invited or encouraged by the conduct of defendant's counsel, unless it is clear that the impropriety complained of amounted to a deprivation of some constitutional or statutory right guaranteed to the defendant. Klein v. State, 15 Okla. Cr. 350, 176 Pac. 414.

Complaint is also made that the defendant was prevented from having a fair trial because certain defense witnesses were arrested upon a charge of perjury immediately after they had testified.

It appears from the record that the witness Gus Johnson was arrested by the sheriff in the hall of the courthouse, away from the presence and out of the hearing of the jury, immediately after he had concluded his testimony. It further appears that on the next day an account of this arrest appeared in the daily papers, and that the court, in the presence of the defendant and his counsel, inquired of the jury if they had read any account of any part of the trial in any newspaper and they all gave a negative answer. It further appears that the witness Ray Clark was also arrested out of the presence and hearing of the jury, after he had testified for the defendant, and that thereupon Mr. Bell, counsel for defendant, came into open court and in the presence of the jury told the court that the county attorney had caused the arrest of these two witnesses for perjury. Thereupon the court rebuked counsel for making this declaration in the presence of the jury, and admonished the jury that they were not to pay any attention to that or be influenced in any manner by the arrest of these witnesses.

It is not improper for the state to cause the arrest of witnesses whom the county attorney believes have committed perjury, but great care should be exercised to see that this is not done in the presence or hearing of the jury, and that knowledge of such arrest shall be kept from the jury. Where counsel for defendant himself imparts such information to the jury, he will not be permitted to predicate error thereon.

In this connection defendant further contends that the arrest of these witnesses intimidated the balance of the witnesses for defendant.

It appears from the record that all of the witnesses subpoenaed by the defendant testified in the case, and there is nothing in the record to indicate that they were intimidated or prevented by such arrests from testifying fully and completely in the case.

Complaint is also made that the county attorney was guilty of misconduct in his cross-examination of defendant.

The witness was asked:

"Q. Mr. Bond, you haven't lived at Oklahoma City always, have you? A. I have always claimed that as my home. Q. You came from Washington to Oklahoma City? A. No, sir. Q. This lady who took the stand yesterday in your behalf is your wife at this time? A. Yes, sir. Q. You were formerly married to a lady named Mamie Bond? A. Yes, sir. Mr. Davis: We think this is incompetent, irrelevant and immaterial, and don't think he should go any further with it. The Court: Well, just let him go ahead and when you want to object you may do so. Mr. Oldham: Do you state that you and Mamie Bond never lived in Washington, D. C.? A. No, sir. Q. I will ask you if, as a matter of fact, you and Mamie Bond were not citizens and residents of the city of Washington, D. C., in the year 1914? A. No, sir. Mr. Davis: We object to any evidence with reference to any person not a party to this suit, and any reference to Mamie Bond; it is incompetent, irrelevant and immaterial. The Court: Sustained. Mr. Oldham: I will ask you if you and Mamie Bond did not move from Washington, D. C., to Oklahoma City? Mr. Davis: We object to any examination with reference to Mamie Bond other than what has already been made, because it is incompetent, irrelevant and immaterial, and prejudicial. The Court: Sustained. A. No, sir."

This cross-examination was improper, but counsel made no objection except as to any further examination, and this objection was promptly sustained by the court and no other questions asked.

This court has no way of knowing whether any of the jurors knew who Mamie Bond was or what she had previously done, nor can we understand why the county attorney would ask these questions unless he thought some of the jurors might know who she was, and might seek to prejudice the defendant by connecting him with her and in transactions she might have had.

We cannot say from the whole record that defendant might not have been prejudiced by this improper examination.

The ends of justice will be met by modifying the judgment and reducing the punishment from four to three years in the penitentiary, and, as modified, the cause is affirmed.

DAVENPORT, P. J., and EDWARDS, J., concur.