R. H. HOWARD v. STATE.

No. A-9674.   Sept. 4, 1940.
(105 P. 2d 440.)

Fred L. Patrick and Ray McElhinney, both of Sapulpa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Everett S. Collins, Co. Atty., of Sapulpa, for the State.

BAREFOOT, J. The defendant, R. H. Howard, was charged in the district court of Creek county, with the crime of malicious mischief; was tried and found guilty by a jury, and his punishment assessed at two and one-half years in the penitentiary, and he has appealed.

The defendant was charged under section 2325, Okla. Stats. 1931, 4 O. S. A., § 1751, which is as follows:

"Every person who maliciously, wantonly or negligently either:

"1. Removes, displaces, injures or destroys any part of any railroad, or railroad equipment, whether for steam or horse cars, or any track of any railroad, or of any branch or branchway, switch, turnout, bridge, viaduct, culvert, embankment, station house, or other structure or fixture, or any part thereof, attached to or connected with any railroad; or,

"2. Places any obstruction upon the rails or tracks of any railroad, or any branch, branchway, or turnout connected with any railroad, is punishable by imprisonment in the penitentiary not exceeding four years or in a county jail not less than six months."

Defendant was charged jointly with James McCoin, who was used by the state as a witness against the defendant.

For a reversal of this case it is urged that the witness James McCoin being an accomplice, his evidence was not corroborated in the manner prescribed by law; and that the evidence was not sufficient to warrant a conviction of defendant; and that certain evidence was permitted to be introduced by the court that was inadmissible, to the prejudice of defendant. All of these errors may be considered together.

The information charged that defendant, R. H. Howard, and James McCoin, on the 8th day of December, 1937, did: "maliciously, feloniously, wantonly, unlawfully, and wrongfully place an obstruction upon the St. Louis-San Francisco Railroad Company tracks, one 1934 model, one and one-half ton Chevrolet truck, * * * near the town of Bowden, Creek county, Oklahoma, * * *".

The evidence in this case reveals that defendant, on and prior to December 8, 1937, was the owner of a 1930 model Ford truck, a 1936 model Chevrolet sedan, and a 1934 model Chevrolet truck. These trucks and the sedan were mortgaged to the Rainbow Motor Company. There were two mortgages; one covering the two trucks, and one covering the sedan and the 1934 Chevrolet truck. These mortgages had been assigned to the Barry Investment Company, who were the owners thereof on and prior to the 8th day of December, 1937.

The Barry Investment Company filed a replevin suit in the common pleas court of Tulsa county in which it replevined the cars above described. The deputy sheriff secured possession of the Ford truck and the Chevrolet sedan on the 7th day of December, 1937. The record re-

veals that there was due on the mortgage covering the two trucks a balance of $170.15, and that the Ford truck was sold for $15. The 1936 Chevrolet sedan sold for $392.10. The record does not reveal the amount due on that mortgage. In rendering judgment in the replevin action the court permitted evidence that the 1934 Chevrolet truck had been destroyed and could not be returned, and a judgment was returned against the defendant, Howard, for $250, in lieu thereof. Pieces of the Chevrolet truck were afterwards secured and sold for $10.

The deputy sheriff who served defendant with the replevin writ on the 7th day of December, 1937, testified that he could get no information from defendant as to the whereabouts of the 1934 Chevrolet truck, and that he did not secure possession of the same under the writ.

The owner of the mortgage testified that the company had no insurance policy covering the 1934 Chevrolet truck. That on December 9, 1937, the defendant called her and told her the truck was parked at Red Fork, but that after an investigation there it was not found.

The facts as testified to by the witness James McCoin were that he was acquainted with defendant, R. H. Howard, who was engaged in hauling sand and rock in the city of Tulsa, and improving lawns, terraces, etc. That he employed a number of men to work for him at different times. That defendant owned two trucks; a Ford and a Chevrolet, and also a Chevrolet sedan. That he had been working for defendant for about a year, and that on the morning of the 8th of December, 1937, defendant came by his house as was his custom, and that he parked the Chevrolet truck he was driving some two or three blocks from the house. It was about 8:00 or 9:00 o'clock in the morning, and defendant said he wanted him to work. He got

into the truck with defendant and he told him that the finance company had taken his Ford truck, and was wanting his Chevrolet truck, and he said, "that he would see them in hell before he would let them have it."

The witness then related that they stopped and defendant asked him if he knew where there were any good cliffs, or anything like that, "we could drive the truck off enough to wreck it so he could collect the insurance on it." He said he had a $500 insurance policy on the truck, and if he could collect it he could pay the bills and have money left. He further testified that defendant told him he would give him $5 if he would go with and assist him, and this witness agreed to do. Defendant drove out toward "Devil's Canyon", and decided that a train would be the best. They went to the small town of Red Fork, and to Oakhurst crossing, and just before they got to the railroad crossing they stopped and left the motor running. Defendant then told the witness that he did not have enough gas to keep the truck running until a train came and defendant left and went to a filling station for the purpose of getting some gas. Before he left witness asked him, "What do you want me to do if a train comes along?", and defendant said, "Just pull it out on the tracks and pretend it stopped", and witness told him, "All right". Defendant returned and put some gas in the truck, and went back to the filling station to get something to eat. That soon after defendant left he heard a train coming a good ways from him, and that he drove on the tracks and slipped the clutch and killed the motor. Just at this time two guys came along and stopped and told him he had better get off the tracks as a train was coming, and they asked him if he needed any help, and he told them he did, and they helped him push the truck off the tracks, and they told him to put it in gear and start it, and he drove to the filling station where

defendant was, and they put some gas in the truck and defendant asked him iff he thought they could beat the train to the Bowden crossing, and witness said: "I don't know, we would have to go pretty fast if we do", and defendant said: "Well, we will try". The train outdistanced them and they drove to the town of Red Fork, and defendant said:

"Well, we might have a better chance tonight and there won't be nobody to see us, either. We will park the truck here at Red Fork and catch a bus into town and go to a show, or something, until tonight and come back out."

They then caught the bus into Tulsa and went to two shows, getting out of the last one after dark. The witness then testified that they went to Fifth and Main and caught a bus to Red Fork, and then got in the truck and drove out to the Bowden crossing. They turned around and came back and parked just a little ways from the crossing and cut the lights out and left the motor running. In a few minutes they saw a train coming and defendant told him to pull up on the track and come back away from it. The witness did this, but as there were several tracks he did not get on the main line and the passenger train passed and missed them. He testified that defendant ran about 200 yards away and that he stood by the truck when he saw the train was not going to hit it. That defendant returned and asked what happened, and he told him the motor stalled on him and happened to stall on the wrong track, and defendant told him: "Well, back it up again. We will wait. There might be another one come along, but that was our best chance. That they could not have a better one."

The witness further testified:

"So we backed the truck off the tracks and waited awhile, and we didn't think there was a train coming, so

he said, 'We will go back to Tulsa. There might be a train between here and there.'

"So we started across the tracks and we got just about 50 or 100 yards from the tracks, and we saw the light coming around the tracks and we knew it was a train, so he said, 'Back it up on the tracks', so I backed it up and the bed we had right across the main tracks there, and we got out and run back down the road there a good ways from the wreckage until the train hit it, and then we turned and ran on down the road and he went across the fence toward the tracks, and I went the other way across— I thought it was a cornfield; it was after night. And I went across the field up there about a quarter of a mile, and turned around and came back down there and the brakeman on the train—it had stopped—and he was looking at the wreckage.

"I went back to the wreck and the brakeman asked me if it was my truck and I told him no. That was all I said. So they went ahead and cleared the wreckage away from the right of way so they could move on through, and after the train left I went back to the crossing and hollered for Mr. Howard, and I hollered several times, and couldn't get no answer, so I went back on the highway so the lights would shine on me, I thought maybe he would see me and come back down there. I went out there and stood maybe 20 minutes, and didn't see no sign of him, so I started walking toward Tulsa, and I got down there to a grocery store about a quarter of a mile from the crossing, and went around and saw it was closed, and I went and asked a lady that must have lived in the back if she had a 'phone I could use, and she said she never, but that there was one about a mile up toward Sapulpa. I didn't come back toward Sapulpa. I started walking on toward Tulsa. I got down there, and asked a couple of men at a filling station if they had a 'phone I could use, so none of them had one, and I started on walking toward Tulsa, and I got about five miles and a yellow truck with an open top came along, and they picked me up and brought me to Fifth and Maybelle streets, and I got out and walked down to my house, and my wife was in bed and I went in and went

to bed and told her what had happened, all of it, and told her Mr. Howard had me promise I wouldn't say nothing about it to nobody; she said she wouldn't say nothing; so the next morning Mr. Howard came down to my house and my wife asked if if he wanted me to work, and he said yes, he was going to take me to the other side of town; he wanted me to work over there. So we walked over toward my sister's, and he went down to Buster somebody's house, and I went on up to my sister's house, and she told me the sheriff was down there looking for Mr. Howard."

From the above statement of this witness' testimony it will be noted that he was an accomplice, and it was necessary for his evidence, under the law to have been corroborated. The statement which he makes, coupled with the fact that he had served a term in the State Training School for White Boys at Pauls Valley, and had been charged with the theft of an automobile, fully substantiates the reason for the rule requiring those who are accomplices to be corroborated before a conviction can be had upon their testimony. It is, therefore, necessary to look to the other evidence introduced to find if the testimony of the witness James McCoin is corroborated.

The defendant took the witness stand, and his evidence corroborates the evidence of the witness McCoin in many respects as to the trip taken by them on the 8th of December, 1937, except that defendant denies that any conversation was had between him and the witness with reference to the destruction of the truck, and that he at no time made any offer of $5 to the witness if he would help him destroy it. He never at any time paid him $5; that he did not tell him he had $500 insurance on the truck, and as a matter of fact there was not a dollar of insurance on the same, taken by himself, or by the company which had a mortgage thereon; that on the morning of the 8th day of December, 1937, he picked up James McCoin and they

went to secure a truck load of rock; that they took the course outlined by the witness McCoin, but they were in search of suitable rock, that the engine of his truck was continually stopping up, and that it became necessary for him to go to a filling station and get gas and that he returned and put some gas in the truck, and they then proceeded to the filling station where he had the tank filled; that they proceeded to the little town of Red Fork, and that the truck was giving them so much trouble and the weather was so cold that he parked the truck and went to Tulsa on the bus, as testified to by the witness McCoin; that they went to two shows, and when they got out of the second show about 7 p. m. that he went to his home, and that the witness McCoin said he was going to his home, and they parted; that he did not return to Red Fork, and did not see the truck after he had parked it there on the evening of the 8th of December, 1937; that he telephoned the secretary of the company the next morning that the truck was parked at Red Fork, and that he did not know of its destruction until later when he was arrested. He denied being with the witness McCoin at the time the truck was driven upon the track at the Bowden crossing, or that anyone saw him there.

Defendant further introduced as witnesses three negro boys who testified that they came to his home in Tulsa on the evening of December 8, 1937, between 7 and 8 o'clock for the purpose of trying to procure work. That they had a conversation with defendant with reference to securing a job at that time. He further introduced in evidence four character witnesses who testified to his good character and reputation prior to the time these charges were brought against him. One of these was a prominent member of the Tulsa Bar, for whom he had worked for several years.

Two of the other witnesses were ministers of the gospel, and the defendant and his wife had been members of the church.

The evidence relied upon by the state to corroborate the evidence of the witness McCoin was principally given by two witnesses, Fern McCoin, a sister of the witness James McCoin, and a witness by the name of C. E. Frew.

Fern McCoin testified that she was a widow; that she had a small child, and lived in Tulsa; that she had known the defendant, Howard, for several years; that her brother lived with her prior to his marriage, and that defendant came to see her quite often; that he bought a new Chevrolet sedan, and kept it at her place instead of his own home, and that he directed her to use it just as if she owned it; that there had never been any improper relations between her and the defendant, but that defendant had told her he was having some trouble at home, and that he was not happy, and that he thought a great deal of her; that during the time the car was in her possession her brother drove it quite frequently with her consent. During the time this car was in her possession, it was taken by some-one and damaged, but the insurance company settled with the company that had the mortgage on the same for the damage. She further testified that on the 9th day of December, 1937, she saw the defendant at her home. That her brother and another party were there; that she told him about the sheriff being there the day before and about the Highway Patrol being there that afternoon; that while the defendant was there, the officers came, and she informed him, and that he ran out at the back door and left; that defendant afterwards sent a taxi to her home, and she went driving with defendant, and told him the officers had taken her brother, and asked him what it was about, and he said: "I knew they was wanting him and they

want me too"; and that when she pressed him as to the reason for all of it, he said he did not think there was much to it, and that he would go over in the morning and give himself up, and that her brother would be all right. He then asked her not to mention to the officers of having seen him, and that defendant asked the taxicab driver if he needed him as a witness would he come, and he said yes, and gave them his address. He did not testify.

This witness gave a great deal of unimportant and incompetent evidence. There was no objection to the same on the part of the defendant.

The witness C. F. Frew testified that he lived in Tulsa, and that on the 8th day of December, 1937, he lived a quarter of a mile west of Bowden; that on returning from his work to his home on that date he saw a truck that looked like it was stuck just off the railroad track; that it was dark and the lights were out; that when he drove up the defendant had the hood up; that he had his lights shining on defendant and told him that he had a flashlight if he needed it; that defendant told him he did not need it; that he had an oil line stopped up and had it just about fixed. The witness said he saw defendant did not want any help and he drove on. He positively identified the defendant as being the party he saw, and said there was a boy 16 or 17 years old standing on the opposite side. He said the truck was standing "just this side of Bowden about two or three hundred yards". This is the exact spot where the freight train struck and destroyed the truck. The defendant's testimony was that he was not present at the time the truck was struck and destroyed.

Other evidence was offered by the state which corroborated the witness McCoin as to the fact of the destroying of the truck, the passing of the different trains, the

securing of the gasoline and other minor details. It is unnecessary to detail this evidence; a portion of it will be hereafter referred to. The evidence of the two witnesses above mentioned was sufficient corroboration under the law if their testimony was believed by the jury, who found the defendant guilty.

As stated by this court in the case of Hufford v. State, 61 Okla. Cr. 141, 66 P. 2d 529, 532:

"It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstance thereof."

See, also, Bond v. State, 54 Okla. Cr. 39, 14 P. 2d 425; Underwood v. State, 36 Okla. Cr. 21, 251 P. 507; McCurdy v. State, 39 Okla. Cr. 310, 264 P. 925; Patterson v. State, 42 Okla. Cr. 255, 275 P. 387; Bradley v. State, 43 Okla. Cr. 456, 279 P. 920; Morton v. State, 46 Okla. Cr. 361, 287 P. 1087.

It is further contended that certain evidence was permitted to be introduced in this case which was incompetent and prejudicial. An examination of the record reveals that a great deal of incompetent testimony was admitted, but the record also reveals that no exception or objection to the evidence was made by the defendant to the introduction thereof. In the motion for new trial there are no grounds stated which cover this objection. The first time it was raised is in the brief of defendant filed in this case.

The evidence of the witness E. S. Clark was largely incompetent and related to conversations had by this wit-

ness with parties not in the presence of defendant. This character of evidence was clearly incompetent, and if proper exceptions had been taken thereto might constitute cause for a reversal of this case, but no objections or exceptions were taken thereto. It is unnecessary to review this evidence.

After reading this record in its entirety, one's mind is left in doubt. The legal propositions offered for a reversal are insufficient to reverse the same. After reading the record and examining the verdict of the jury which gave the defendant two and one-half years in the penitentiary, one can but come to the conclusion that the jury may have come to its conclusion by reason of some passion or prejudice. Either the evidence caused it, or the fact that the jury was highly indignant because of the nature of the offense, and especially the fact that an effort was made to block the railroad crossing and there endanger the lives of many innocent persons, especially had a passenger train been derailed. Viewing it from this standpoint the jury was justified in rendering the verdict which they did. But in an examination of the record from another standpoint, we find that there was no insurance on the truck that was destroyed, either by the defendant or the mortgage company. There could have been no damages collected for the destroying of the truck and the only motive which the defendant could have had for destroying the same was his desire to keep the mortgage company from securing possession thereof.

There was also a great deal of evidence offered with reference to the relation between defendant and the witness Fern McCoin which could have been considered unfavorable to the defendant.

The witness E. S. Clark, a highway patrolman, was permitted to testify without objection by defendant to

many conversations had with other parties, and which conversations were not in the presence of the defendant and were clearly hearsay. These statements were made while this witness was investigating this case and which resulted in his arrest. The witness H. A. Stafford, a highway patrolman, was also permitted to testify to many hearsay statements, not in the presence of the defendant.

At the time the motion for new trial was presented and overruled, the trial court said:

"Gentlemen, it has been a long time since I have tried a case where as many upstanding prominent citizens oppose a parole on one side, and ask one on the other, as in this case.

"You gentlemen understand that in every criminal case it is always the innocent ones who suffer more than the ones found guilty.

"In this case, gentlemen, the state went to quite a little trouble and expense preparing the case for trial, as shown by the record in the case at the trial, and on my part, I believe you gentlemen will agree that I gave you plenty of time to select your jury and try the case. We had a fine jury panel, and the men who sat in the trial of this case were all upstanding citizens, and some of them were prominent business men.

"Of course, you gentlemen understand the appellate court has the authority to review and pass upon the fairness of these proceedings, and the Governor the authority to parole in these matters".

We believe that if the trial court had the right under the law to modify the sentence after it was returned by the jury without the necessity of granting a new trial, and having the expense of such new trial placed upon the county, he would have done so. This court has that right under the law.

After a careful consideration of this record, we are of the opinion that justice would be best subserved if the

judgment and sentence be modified from two and one-half years in the penitentiary to one year in the penitentiary, and as so modified the judgment of the district court of Creek county is affirmed.

DOYLE, P. J., and JONES, J., concur.